AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No.2:24-mj-00357 |
| | ) | |
| Public Storage Unit 2036 located at 19102 E Walnut Drive N, Rowland Heights, California 91748 ("SUBJECT LOCATION") | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956, 1957 | Money Laundering |
| 18 U.S.C. § 1029 | Access Device Fraud |
| 18 U.S.C. §§ 1344, 1349 | Bank fraud and Conspiracy |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☒ Delayed notice of  30 days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Saif Raad Albazzaz
_____
*Applicant's  signature*

Special Agent Saif Raad Albazzaz, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA               </u>

_____
*Judge's  signature*

Hon. Alka Sagar, U.S. Magistrate Judge
*Printed name and title*

AUSA: A. Brammell (619) 546-7996

**ATTACHMENT A**

PREMISES TO BE SEARCHED

Public Storage unit 2036 is a 5'x5' storage unit located on the northwest corner of the second floor of Building B at Public Storage facility located at 19102 E Walnut Drive N, Rowland Heights, California 91748. Unit 2036 has an orange hinged metal door with a sign that reads "PS 2036" located just above the door. The lock on the door is a Public Storage standard cylinder lock.

Building B is a three-story white, red, and gray brick building located on the southeast corner of the Public Storage facility. The only sign on Building B is a "Loading" sign in white and orange color located just above the main entrance door to Building B on the west side. There are no signs on Building B indicating that it is Building B. However, based on Public Storage database, official records obtained from Public Storage, and the confirmation of Public Storage staff, the building in which storage unit 2036 is located is officially referred to as "Building B".

Eight storage units on the first floor of Building B are accessible from the outside on the west side of Building B. The only entrance to Building B is through an automatic double sliding glass door located on the west side of Building B. The only way to reach unit 2036 on the second floor is via the elevator located in the first-floor lobby of Building B. The elevator requires an access code that must be entered using a keypad near the elevator. There are two stairwells in Building B; STAIR 1 is located near the elevator and STAIR 2 is located on the southeast corner of Building B. The two stairwells can only be used to exit Building B during the facility's operating hours. The stairwells will sound an alarm if used to exit after operating hours. The two stairwells cannot be used at any time to go upstairs and access the floors where the storage units are located.



Overhead view of Public Storage Facility.
Orange: Public Storage Facility
Red: Building B



Building B – West Side – Main Entrance

41




Building B – Southwest Corner        Building B – South Side



Building B – Second Floor Plan – Unit 2036


Unit 2036 - Door


Unit 2036 - Hallway



Unit 2036 - Lock

**ATTACHMENT B**

I.  ITEMS TO BE ELECTRONICALLY COPIED

1.   All records contained on computer hardware, computer software, computer-related documentation, or storage media found in Attachment A that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 1956, 1957 (money laundering); 18 U.S.C. § 1029 (access device fraud); 18 U.S.C. §§ 1344, 1349 (bank fraud and conspiracy); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 371 (conspiracy).

II.  ITEMS TO BE PHOTOGRAPHED OR COPIED

2.   Books, records, receipts, notes, ledgers, money orders, and other papers in relation to transportation, ordering, sale, and distribution of any skimming materials and the profits derived from those transactions; Photocopies or digital images of papers, airline tickets, passports, notes, schedules, receipts, and other items relating to domestic or foreign travel; Photocopies or digital images of United States currency, foreign currency, precious metals, jewelry, financial instruments including but not limited to, stocks and bonds;

3.   Books or papers which reflect names, addresses, and/or telephone numbers of co-conspirators involved in skimming activities;

4.   Any and all items associated with skimming activities, including, but not limited to, ATM skimming devices, Point of Sale (POS) terminal overlay skimming devices, components of skimming devices, tools used to install/remove skimming devices, pinhole cameras, components of pinhole cameras, micro SD cards, soldering equipment and materials, electronic circuit boards, batteries, ATM parts, replicas of ATM parts and POS terminals, computers, phones, any other electronic devices, packaging, glue stickers, magnets, ATM cards, machines/devices used to encode

44

data on ATM cards, and all other items that are related to
skimming activities;

     5.    Indicia of occupancy, residence, ownership, or lease
of the premises identified on the warrant, including but not
limited to utility and telephone bills, other mail, and keys;

     6.    Any firearms, ammunition and/or paraphernalia
including, but not limited to, magazines, holsters, and gun
boxes;

     7.    Any photographs, in particular, photographs of co-
conspirators, of assets, and/or of any photographs associated
with skimming activities;

     8.    Areas and layouts within the SUBJECT LOCATION,
including, but not limited to, areas believed to be used for
furtherance of skimming activities.

**DEFINITIONS**

For the purpose of this warrant:

     A.    "Computer equipment" means any computer hardware,
computer software, computer- related documentation, storage
media, and data.

     B.    "Computer hardware" means any electronic device
capable of data processing (such as a computer, personal digital
assistant, cellular telephone, or wireless communication
device); any peripheral input/output device (such as a keyboard,
printer, scanner, monitor, and drive intended for removable
storage media); any related communication device (such as a
router, wireless card, modem, cable, and any connections), and
any security device, (such as electronic data security hardware
and physical locks and keys).

     C.    "Computer software" means any program, program code,
information or data stored in any form (such as an operating

system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D.   "Computer-related documentation" means any material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

E.   "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, USB or thumb drive, or memory card).

F.   "Data" means all information stored on storage media of any form in any storage format and for any purpose.

G.   "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols. As used above, the terms "records" and include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

**AFFIDAVIT**

I, Saif Raad Albazzaz, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since January 2019. I am assigned to the Organized Crime squad in San Diego FBI Field Office. As a member of this squad, I investigate complex, criminal-enterprise activity, such as money-laundering, racketeering, and more. Based on this training and experience, I am familiar with the manner in which such crimes are perpetrated; and techniques, methods, or practices commonly used by these criminal enterprises. Prior to my assignment to the Organized Crime squad, I was assigned to a counterterrorism squad within the San Diego FBI Field Office where I conducted investigations related to National Security. I have received 20 weeks of training at the FBI Academy in Quantico, Virginia. During that training, I received instruction regarding a wide variety of investigative techniques that are commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of Confidential Human Sources, electronic and physical surveillance techniques, law enforcement tactics, search and seizure laws and techniques, interviewing strategies, forensic techniques, and a variety of other subjects.

2.   Through training, interviews, and collaboration with several local, state, and federal agencies, I am familiar with

the actions, traits, and habits utilized by subjects involved in skimming activities. I have also participated in hundreds of hours of surveillances associated with skimming activities. Based on my training and experience, I am aware that subjects involved in skimming activities generally keep and maintain skimming equipment and materials in their possession. Experience in similar cases has established that such equipment and materials are regularly concealed in a suspect's residence, automobile, office, storage units, concealed compartments, on their person, or other locations that are considered safe. Such equipment and materials commonly concealed take various forms and include, but are not limited to, hidden skimming devices inside music speaker boxes and karaoke machines, pinhole cameras wrapped in clothing items or plastic bags, stacks of ATM Cards hidden in cardboard boxes and bags, notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, or train tickets) both commercial and private, money orders and other papers or documents which contain evidence relating to skimming activities.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.  I make this affidavit in support of an application for a search warrant pursuant to Federal Rules of Evidence 41, and 18 U.S.C. § 3103a, for evidence of violations of 18 U.S.C. §§ 1956, 1957 (money laundering); 18 U.S.C. § 1029 (access device

fraud); 18 U.S.C. §§ 1344, 1349 (bank fraud and conspiracy); 18 U.S.C. § 1028A (aggravated identity theft); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 371 (conspiracy) (the "SUBJECT OFFENSES") at the following property described below and further described in Attachment A, which is fully incorporated by reference:

a.   Public Storage Unit 2036 located at 19102 E Walnut Drive N, Rowland Heights, California 91748, (the "SUBJECT LOCATION").

4.   Pursuant to 18 U.S.C. § 3103a(b), and as stated in more detail below, I submit that there is reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result, and I request that the search warrant both prohibit the seizure of any tangible property and provide for the giving of any notice required under Rule 41 to be delayed for **30 days** after the date of execution. I also request that the search warrant permit the seizure of stored wire and electronic communications as detailed below and in Attachment B, because there is reasonable necessity for the seizure.

5.   As described further below, the agents will execute the warrant by surreptitiously entering the SUBJECT LOCATION at night by forcible entry, and on multiple occasions if necessary, in order to affect a search including opening locked areas, containers, or other facilities, and inspecting documents and other tangible objects of any kind found within the premises or on the property. In order to maintain the covert nature of the

3

entry and search for the reasons articulated herein, agents will inspect, defeat, alter or delete any preexisting surveillance equipment that is encountered.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

7.    The FBI has been investigating a group of Romanian nationals involved in "skimming" activities targeting the Electronic Benefit Transfer ("EBT") program. EBT is an electronic delivery system that allows the recipients of welfare benefits, including cash assistance and food stamps, to use a card, much like a debit card ("EBT Cards"), to access their cash and food benefits distributed by the federal and state governments the first three days of every month part of the federal Supplemental Nutrition Assistance Program ("SNAP").

8.    From the investigation, I have learned that the group installs electronic skimming devices, usually undetectable by the users, on Automated Teller Machines ("ATMs") to secretly record data from EBT Cards inserted into the ATMs. Hidden pinhole cameras are usually installed on parts of the ATMs to capture users'

4

Personal Identification Numbers ("PINs"). Stolen EBT Card numbers and PINs are then used to clone the users' EBT Cards. The cloned EBT Cards are then used to steal victims' EBT cash by withdrawing cash from ATMs when benefits are deposited in the early morning hours of the first, second, and third days of the month.

9.     As detailed below, investigators have identified Costel Gherasie ("GHERASIE") and Marian Sandu ("SANDU") as two individuals who install skimming devices and cash out EBT benefits using stolen EBT Card Numbers and PINs. Investigators have identified the SUBJECT LOCATION as a storage unit rented by SANDU and utilized by SANDU and GHERASIE. There is probable cause to believe that searching the SUBJECT LOCATION will produce evidence of a crime and reveal the location of contraband, fruits of crime, and other items illegally possessed relating to skimming activities, and conspiracies to do the same, such as skimming equipment and electronic devices.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Background of Investigation

10.     Based on data received monthly from California Department of Social Services ("CDSS"), the current losses associated with EBT skimming in California is approximately $6-7 million per month. The current losses in San Diego County are approximately $300,000 per month. Between September 2021 and November 2022, the state of California lost approximately $60 million; meanwhile, San Diego County lost approximately $3.5 million.

11.   FBI intelligence and other intelligence received from local, state, and federal, law enforcement agencies suggest these crimes are being committed by groups or cells of Romanian nationals, often entering the country illegally or with false identifications. At this time, it is unknown how much communication occurs between cells or if there is a structure directing the cells on where and how to operate. Intelligence suggests much of the stolen funds is sent back to Romania via different means to fund Romanian criminal organizations.

12.   In early 2023, FBI San Diego received several reports of EBT skimming incidents from state and local partners in San Diego County, including San Diego Sheriff's Department (SDSD), San Diego Police Department (SDSD), and San Diego County Bureau of Public Assistance Investigation (BPAI). In April 2023, FBI San Diego opened a full investigation to identify individuals and criminal enterprises involved in EBT skimming activities.

**B.   Identification of GHERASIE and SANDU**

13.   Beginning on May 1, 2023, investigating agents initiated surveillance operations at ATMs in San Diego County. The goal of the surveillance was to monitor ATMs for any suspicious activities during the first three days of the month, specifically around midnight and early morning hours. A few minutes after midnight, surveillance units observed an unknown male suspiciously using several ATM cards rapidly at a US Bank walk-up ATM located at 4195 Genesee Avenue in San Diego, California 92111. The unknown male returned to a 2007 Green Dodge Caravan bearing California license plate 8ZSU282 ("Green

Caravan"), which was registered to a Costel GHERASIE
("GHERASIE") of 18587 Colima Road, Apt A, Rowland Heights,
California 91748. Using the California DMV records for
comparison, surveillance officers who witnessed the unknown male
determined that he matched the California DMV photograph of
GHERASIE the Green Caravan's Registered owner.

14.   Thereafter, according to surveillance agents, GHERASIE
drove the Green Caravan while engaging in countersurveillance
techniques, including driving in circles in the parking lot and
conducting illogical U-turns on the main roads before parking in
a nearby residential neighborhood where he was picked up by a
2009 Silver Volkswagen Passat bearing California license plate
9AOW385 ("Passat"). The Passat was registered to a Viorel
Ciuraru of 120 N Magnolia Avenue, Apt 8, Hacienda Heights,
California 91745. Based on database checks, Ciuraru did not
appear to be a real person, and the address on the Passat's
registration did not exist. The Passat drove to a house located
at 5859 Chateau Drive, San Diego, California 92117, which based
on records checks appeared to be a short-term rental ("STR").
There, GHERASIE and the driver of the Passat entered the house
and remained inside until surveillance was terminated.

15.   On May 1, 2023, at approximately 10:00 p.m.,
surveillance was reinitiated at the STR at 5859 Chateau Drive,
San Diego, California 92117. At approximately 11:45 p.m., two
unknown males were observed leaving the house and entering the
Passat. Around the same time, GHERASIE was observed leaving the
house and entering his Green Caravan. A surveillance team

followed the Passat to the US Bank walk-up ATM located at 3201 University Avenue, San Diego in California 92104. There, the passenger in the Passat began conducting several ATM transactions while continually looking over his shoulder and scanning the parking lot for passerby vehicles and people. Approximately 20 minutes later, the unknown male left the ATM and walked across the street near a CVS parking lot where he was picked up by the Passat.

16.   A second surveillance team followed GHERASIE in his Green Caravan to a US Bank walk-up ATM located at 4195 Genesee Avenue, San Diego in California 92111. There, GHERASIE circled the bank parking lot several times before parking a short distance from the bank parking lot. Just after midnight on May 2, 2023, GHERASIE walked to the US Bank walk-up ATM and conducted several transactions for approximately 15 minutes. GHERASIE then returned to his Green Caravan and sat in it for a couple of minutes. GHERASIE then walked back towards the same US Bank walk-up ATM. Just before GHERASIE reached the ATM, another customer walked up to the ATM and started using it, which prompted GHERASIE to keep walking to San Diego County Credit Union walk-up ATM located nearby at 5407 Balboa Avenue, #420, San Diego, California. There, GHERASIE was observed using the ATM for approximately five minutes before returning to his Green Caravan.  GHERASIE then drove back to the STR.

17.   On May 2, 2023, at approximately 12:48 p.m., the Passat drove to the Bank of America Bank located at 4002 Clairemont Mesa Boulevard, San Diego, California 92117. There,

the driver of the Passat used the walk-up ATM and then returned
to the STR. Based on database checks conducted on GHERASIE's
address, 18587 Colima Road, Apt A, Rowland Heights, California
91748, the driver of the Passat matched the descriptions of and
was identified as Marian SANDU, who shared the same address with
GHERASIE.

18.  On May 13, 2023, surveillance units observed SANDU
sitting in the Passat for extended periods of times near Bank of
America located at 4002 Clairemont Mesa Boulevard, San Diego,
California 92117 with a clear view of the walk-up ATMs located
on the west side of the bank.  Bank of America later provided
ATM surveillance footage from May 13, 2023 for all ATMs at Bank
of America at 4002 Clairemont Mesa Boulevard, San Diego,
California 92117. Review of the footage showed SANDU using both
walk-up ATMs to first take out cash using several ATM cards.
Footage then showed SANDU arriving in the Passat later and
installing what looked like a pinhole camera and a skimming
device on one of the walk-up ATMs. The footage then showed SANDU




returning to the walk-up ATMs at a later time pulling out what
looked like a flat metal or plastic item from his jacket's
sleeve and inserting it into the ATM card slot. SANDU kept
manipulating the ATM card slot with the item before hiding the
item back into his jacket's sleeve and leaving the ATMs.

19.   A full assessment of the losses and victims affected
by May 2023 skimming activities mentioned above is ongoing.
However, a preliminary review of California Department of Social
Services ("CDSS") records to identify potential victims of EBT
skimming fraud committed during May 1, 2023 and May 2, 2023
revealed losses of approximately $5,000 on May 1, 2023, between
12:00 a.m. and 12:10 a.m., at the US Bank ATM located at 4195
Genesee Avenue, San Diego, California 92111, when GHERASIE was
observed using that same ATM; $7,900 on May 2, 2023, between
12:00 a.m. and 12:20 a.m., at the US Bank ATM located at 4195
Genesee Avenue, San Diego, California 92111, when GHERASIE was
observed using that same ATM; and $4,320 on May 2, 2023, between
12:00 a.m. and 12:15 a.m., at the US Bank ATM located at 3201
University Avenue, San Diego, California 92104, when an unknown
male was observed using that ATM after being dropped off by the
Passat, which is usually driven by SANDU.

C.   **SANDU and GHERASIE Continue Skimming Operations**

20.   FBI San Diego continued surveillance of SANDU and
GHERASIE at ATMs in San Diego County with the assistance of
tracking devices installed pursuant to state warrants on the
Green Caravan and Passat from June to September 2023. Review of
the tracker data between May 2, 2023 and June 28, 2023 revealed

10

that both the Passat and the Green Caravan were in the immediate vicinity of several banks and ATM locations in San Diego and Los Angeles Counties several times during the month and for extended periods of time.

21.  On June 2, 2023, SANDU and GHERASI were observed using the walk-up ATMs at the Bank of America at 648 Palomar Street, Chula Vista, California 91911 and the walk-up ATMs at the Wells Fargo located at 1232 Broadway, Chula Vista, California 91911.

22.  On June 4, 2023, surveillance units observed SANDU in the Passat parked near the Bank of America located at 4002 Clairemont Mesa Boulevard, San Diego, California 92117. A bank ATM technician was observed at the bank. A surveillance unit spoke with the technician who confirmed that he recovered a skimming device from one of the walk-up ATMs. The skimming device was later collected by FBI San Diego as evidence. SANDU remained in the Passat with a view of the walk-up ATMS for majority of the day.



**D.   Recovery of Skimming Equipment**

23.   Separately on June 4, 2023, Riverside Police
Department (RPD) officers responded to a call regarding
suspicious activities conducted by two unknown males in a white
Range Rover near a standalone Bank of America ATM located at
8151 Arlington Avenue, Riverside, California. RPD officers
identified the two unknown males as GHERASIE and Cosmin Adrian
FILISANU. During a consensual search of the Range Rover, RPD
officers discovered and seized multiple ATM skimming devices and
pinhole cameras attached to replicas of parts of the Bank of
America ATM.

24.   RPD officers also coordinated with Bank of America
technician to check the standalone ATM for skimming devices. A
Bank of America technician found a skimming device installed
inside the ATM. The device was then collected by RPD officers
and later transferred to FBI San Diego with other skimming
devices and pinhole cameras seized as evidence. GHERASIE and
FILISANU were not charged by RPD in connection with this event.
Later review of the ATM footage obtained from Bank of America
regarding this incident showed GHERASIE and FILISANU installing



and removing skimming devices and pinhole cameras at the standalone ATMs.

25.  On June 9, 2023, at approximately 9:05 a.m., physical surveillance observed SANDU suspiciously manipulating Bank of America walk up ATM located at 601 S Rancho Santa Fe Road, San Marcos, California 92078 using items hidden in the jacket and satchel he was wearing. As SANDU was leaving the ATM, SANDU dropped off the back side of a Gorilla Tape adhesive sticker.

26.  Based on my training and experience and examination of several pinhole cameras collected as evidence, subjects use heavy duty adhesive tape, such as Gorilla Tape, to glue replicated parts of ATMs containing hidden pinhole cameras on ATMs to capture victims' PINs.

27.  On June 30, July 1, and July 2, 2023, investigators engaged in surveillance observed both SANDU and an individual identified through open-source material as Constantin RADUCANU making multiple transactions at ATMs in Chula Vista and Escondido, California. On July 1, 2023, at approximately 8:15 p.m., physical surveillance observed SANDU suspiciously manipulate Bank of America Standalone ATM located at 1228 Broadway, Chula Vista, California 91911. SANDU was observed manipulating the ATM using large items, not consistent with ATM cards, from a black backpack that he was wearing on the front of his body.

**E.   Identification of the SUBJECT LOCATION**

28.  On May 2, 2023, state tracker warrant 2305021247-SDPD-MDK-SW was obtained to place a vehicle GPS tracker on the

Passat, driven by SANDU. 19.  On May 30, 2023, state tracker
warrant 2305301646-SDPD-EHM-SW was obtained to continue tracking
the location of the Passat and Green Caravan for another 30
days.

29.  In June 2023, analysis of the Passat's vehicle tracker
data revealed that the Passat, primarily used by SANDU, visited
the SUBJECT LOCATION multiple times during the month of June
2023.  Records obtained from Public Storage confirmed that SANDU
was the primary renter of SUBJECT LOCATION. GHERASIE was listed
as the alternate contact for SUBJECT LOCATION. Public Storage
records revealed that SANDU started renting SUBJECT LOCATION on
June 9, 2023 and that SANDU always paid the rent in cash.

30.  Based on site survey of SUBJECT LOCATION, the only way
to access SUBJECT LOCATION is via the elevator located in the
first-floor lobby of Building B where a security surveillance
camera is located. There are no functional cameras on the
second-floor of Building B. Public Storage provided FBI San
Diego site access history and camera surveillance footage
associated with the SUBJECT LOCATION from the camera in the
first-floor lobby of Building B and from an outdoor security
camera monitoring Public Storage main gate located at the front
of the facility. Review of the footage confirmed that SANDU and
GHERASIE were the only two individuals who accessed the SUBJECT
LOCATION. The vehicles SANDU and GHERASIE drove to the SUBJECT
LOCATION were the same vehicles SANDU and GHERASIE were observed
driving while conducting skimming activities in San Diego and

Los Angeles between May 2023 and January 2024, including the Passat and Green Caravan.

    31.  The SUBJECT LOCATION was accessed on June 9, 2023. SANDU was observed conducting skimming activities in San Diego, including what appeared to be the installation of skimming equipment at an ATM that same day.

    32.  The SUBJECT LOCATION was also accessed on June 29, 2023. On June 30, July 1, and July 2, 2023, SANDU was observed conducting skimming activities in San Diego, including the installation of what appeared to be skimming equipment at an ATM on July 1, 2023.

    **F.    SANDU and GHERASIE Access the SUBJECT LOCATION before and after engaging in Skimming Activities**

    33.  The SUBJECT LOCATION was accessed on July 29, 2023 and July 31, 2023.  Surveillance footage from July 29, 2023 showed SANDU arriving at the SUBJECT LOCATION in the Passat. SANDU entered the elevator, the only point of access to the SUBJECT LOCATION, empty handed. Approximately 30 minutes later, SANDU exited the elevator carrying a long flat unknown item wrapped in paper or plastic bags. The item appeared to be consistent in shape and size with ATM panels containing concealed pinhole




15

cameras that SANDU and GHERASIE were observed, in past surveillance, installing at ATMs. SANDU was also carrying a black duffle bag with white patterns. SANDU departed the SUBJECT LOCATION in the Passat.

34.   On July 31, 2023, August 1, 2023, and August 2, 2023, surveillance units observed SANDU conducting cash outs using several ATM cards at the walk-up ATMs at the Bank of America located at 220 S Escondido Boulevard, Escondido, California 92025 and the Bank of America walk-up ATM located at 730 Nordahl Road, San Marcos, California 92069.

35.   On August 1, 2023, during daytime, SANDU was observed inserting a long, flat item, not consistent with an ATM card, into the drive-thru ATM card slot at the Bank of America located at 220 S Escondido Boulevard, Escondido, California 92025. On August 2, 2023, the manager of that Bank of America location provided investigators with a skimming device and a pinhole camera retrieved by their technicians from the same drive-thru ATM SANDU was observed using on August 1, 2023. The pinhole camera was hidden inside a smoke detector glued to the roof of the drive-thru ATM area. A micro-SD card attached to the pinhole camera contained several video recordings of SANDU standing on the roof of the Passat installing the smoke detector with pinhole camera on the roof immediately above the ATM then inserting a skimming device inside the ATM card slot using a long, flat metal or plastic tool.

36.   On August 2, 2023, surveillance units observed SANDU carrying the same black bag with white patterns when he left San

Diego after conducting skimming activities on July 31, August 1,
and August 2, 2023, including the installation of skimming
equipment at an ATM in Escondido, California.

    37.   The SUBJECT LOCATION was accessed on August 19, 2023.
Surveillance footage showed GHERASIE exiting the elevator empty

 

handed and then exiting approximately five minutes later
carrying two cardboard boxes.

    38.   On August 31, September 1, September 2, and September
3, 2023, surveillance units from FBI San Diego, SDPD, and SDSD
observed SANDU and GHERASIE conduct cash outs at several ATMs in
San Diego County.

    39.   On August 31, 2023, physical surveillance located
GHERASIE in Fullerton, California. GHERASIE was driving a silver
2007 Toyota Camry ("Silver Camry") bearing California license
plate 9HGT413. Surveillance units followed GHERASIE to the Bank
of America ATMs located at 2339 W Whittier Boulevard,
Montebello, California 90640. There, surveillance units observed
GHERASIE installing skimming equipment at one of the ATMs. A

second surveillance team observed SANDU in San Diego, California driving a Green 2006 Kia Sedona ("Green Sedona") bearing California license plate 5WGZ774, which was registered to SANDU. The Green Sedona and SANDU were observed near the Bank of America standalone ATM located at 1228 Broadway, Chula Vista, California 91911.

40.   On September 1, 2023, at approximately 10:13 a.m., surveillance units observed SANDU in the Green Sedona parked near the Bank of America standalone ATM located at 1228 Broadway, Chula Vista, California 91911. At approximately 11:15 a.m., two unknown males were observed installing a pinhole camera and a skimming device at the ATM. The two unknown males seemed to be having a problem installing the skimming device at the ATM. A few minutes later SANDU exited the Green Sedona and stood directly behind one of the two unknown males who was still manipulating the ATM by himself. The ATM seemed to be broken down at that time. SANDU seemed agitated and departed the area in the Green Sedona. A Bank of America technician arrived at the ATM and retrieved two skimming devices stuck together inside the ATM card slot. The technician also retrieved one pinhole camera glued to the top side of the ATM. Surveillance units collected the skimming devices and the pinhole camera as evidence. A micro-SD card was attached to the pinhole camera. The micro-SD card contained video recordings of SANDU installing the pinhole camera and a skimming device at the ATM. Review of another video showed the two unknown males installing a pinhole camera and a skimming device at the same ATM. Approximately an hour and a

half later, SANDU returned in the Green Sedona to the same standalone ATM. One of the two unknown males observed earlier at the ATM returned to the standalone ATM as well. SANDU and the unknown male seemed to be having an argument near the ATM which caused the unknown male to sprint away from SANDU. SANDU chased the unknown male to the intersection and then returned to the ATM. SANDU was then observed installing a new set of skimming equipment at the ATM. SANDU then sat in the Green Sedona and watched the ATM from close proximity.

41. Between September 4, 2023 and September 15, 2023 GHERASIE and SANDU continued skimming activities in San Diego County at several ATMs. SANDU and GHERASIE used multiple vehicles, including a 2011 gold Toyota Sienna bearing California license plate 7MEV091 ("Gold Sienna") and a rental 2023 Black Toyota Camry bearing California license plate 9FOG662 ("Black Camry"). SANDU and GHERASIE moved to different short-term rental properties and Motels while in San Diego.

42. On September 12, 2023, Honorable Barbara L. Major, U.S. Magistrate Judge in the Southern District of California, signed warrant 23MC1572 authorizing the installation of a GPS tracking device on the Gold Sienna. On the same day, agents installed a GPS tracking device on the Gold Sienna in San Diego County.

**G.   SANDU and GHERASIE Continue to Access SUBJECT LOCATION before and after engaging in Skimming Activities**

43. On September 11, 2023, surveillance footage showed SANDU arriving in the Gold Sienna at the SUBJECT LOCATION. SANDU

entered the elevator empty handed and then exited approximately 10 minutes later carrying a small black pursue. The small black purse was very similar to a small black purse surveillance units observed SANDU using while cashing out at ATMs in San Diego on August 1 and August 2, 2023.

 

44.   The SUBJECT LOCATION was accessed on September 16, 2023. Surveillance footage showed SANDU arriving at the SUBJECT LOCATION at approximately 3:13 p.m. in the Gold Sienna. SANDU entered the elevator empty handed and exited the elevator approximately five minutes later carrying a small purse or bag. According to the Gold Sienna's vehicle tracker data, the Gold Sienna was in San Diego the morning of September 16, 2023 near ATMs where SANDU was observed conducing skimming activities in the past. The Gold Sienna left San Diego around 2:00 p.m. and arrived at the SUBJECT LOCATION at approximately 3:13 p.m. The Gold Sienna then departed the SUBJECT LOCATION at approximately 3:20 p.m. and traveled back to San Diego. At approximately 5:39 p.m., the Gold Sienna arrived back in San Diego near Bank of America standalone ATM located at 1228 Broadway, Chula Vista,

California 91911 where SANDU was observed conducting skimming activities several times in the past.



45.    From September 30, 2023 through October 3, 2023, surveillance units observed GHERASIE, SANDU, and RADUCANU conduct cash outs at several Bank of America and Wells Fargo ATMs in San Diego County. GHERASIE and RADUCANU were driving a 2012 white Porsche Cayenne ("White Cayenne") bearing California license plate 9JEM491. GHERASIE and RADUCANU were also observed installing skimming equipment at multiple Bank of America ATMs in San Diego County.

46.    On October 17, 2023, with the consent of Public Storage, agents installed a covert surveillance camera in the hallway of the second floor of Building B at Public Storage facility located at 19102 E Walnut Drive N, Rowland Heights, California 91748. The camera was installed to monitor an area with no expectation of privacy in the hallway where the entrance to the SUBJECT LOCATION is located.

47.   On October 30, 2023, hallway surveillance camera footage showed SANDU opening the SUBJECT LOCATION door and going inside the unit. SANDU was inside the SUBJECT LOCATION for approximately five minutes before leaving empty handed.

 

48.   On October 31, November 1, 2023, and November 2, 2023, surveillance units observed SANDU, GHERASIE, RADUCANU, an individual identified as Miclos MOGODEANU[1], and two additional subjects later identified through open-source searches as Vasile MITRAN and Georgiana Nicoleta Roxana ZORILA cashing out using several Bank of America, Wells Fargo, and US Bank ATMs in San Diego County.

---

[1] MOGODEANU was identified during a traffic stop on June 5, 2023; he provided a North Carolina driver's license bearing his name.

49.   On November 11, 2023, at approximately 9:37 a.m.,
hallway surveillance camera footage showed SANDU entering the
SUBJECT LOCATION carrying what appeared to be a black Tommy
Hilfiger carry-on luggage, a black backpack, and a black
satchel. SANDU exited the SUBJECT LOCATION carrying only the
black satchel.



50.   During physical surveillance on September 9, 2023,
SANDU was observed carrying what appears to be the same Tommy
Hilfiger luggage in San Diego while moving his belongings from
the Green Sedona to the Gold Sienna in a Vons parking lot.



51.   On November 17, 2023, at approximately 9:48 a.m.,
hallway surveillance camera footage showed SANDU entering the
SUBJECT LOCATION empty handed. SANDU then exited the SUBJECT
LOCATION carrying a black backpack. During physical surveillance
on September 9, 2023, SANDU was observed carrying what appears
to be the same black backpack in San Diego while moving his
belongings from the Green Sedona to the Gold Sienna in a Vons



parking lot.

52.   On November 29, 2023, at approximately 3:52 p.m.,
hallway surveillance camera footage showed SANDU entering the
SUBJECT LOCATION empty handed. SANDU then exited the SUBJECT



24

LOCATION carrying what appears to be the same Tommy Hilfiger luggage he left at the SUBJECT LOCATION on November 11, 2023.

53.  From November 30, 2023 through December 3, 2023, physical surveillance conducted by FBI San Diego observed SANDU, GHERASIE, RADUCANU, MITRAN, and a subject, later identified via open-source searches as Roky DUMITRU, cashing out at several ATMs in San Diego County.

**H.   GHERASIE and SANDU Continue to Engage in Skimming Activities and Extend Rental of the SUBJECT LOCATION**

54.  A Bank of America technician contacted FBI San Diego to report that on December 8, 2023, a Bank of America security guard at 9711 Mission Gorge Road, Santee, California 92071 reported observing skimming equipment installed on the walk-up ATMs and a white Range Rover bearing California license plate 7TEE656 ("White Range Rover") nearby watching the ATMs. Investigating agents determined the White Range Rover was registered to SANDU. SANDU was observed during physical surveillance using the same White Range Rover to conduct skimming activities in San Diego County in October 2023, November 2023, and December 2023.  FBI San Diego responded to the bank location and collected two skimming devices and two pinhole cameras from the ATMs.

55.  On December 13, 2023, Public Storage records show that rent was paid in cash for the SUBJECT LOCATION for the month of December 2023 and January 2024.

56.  On January 3, 2023, physical surveillance conducted by FBI San Diego observed GHERASIE and DUMITRU conduct cash outs at

the Bank of America ATMs located at 201 E San Ysidro Boulevard,
San Ysidro, California 92173 and Wells Fargo ATMs at 637 E San
Ysidro Boulevard, San Ysidro, California 92173.  GHERASIE and
DUMITRU then returned to a short-term rental property located at
1145 E 5th Street, National City, California 91950 where they
stayed the rest of the night.

57.  Based on my training and experience, my observations,
the observations of other law enforcement officers, and previous
location data obtained for telephone devices and vehicle
trackers, I believe SANDU, GHERASIE, RADUCANU, MOGODEANU,
FILISANU, and other known and unknown associates (the
"SUBJECTS") are part of a Romanian organized crime skimming crew
targeting recipients of EBT cash and food benefits in different
counties throughout the state of California and possibly in
other states. I believe the SUBJECTS travel to different
counties in California, including San Diego County, on the first
three days of every month to conduct cash-outs and stay for
approximately one to two weeks to install skimming equipment at
ATMs and POS terminals to collect EBT card numbers and PINs. I
believe the SUBJECTS stay in short-term rental properties and
motels, rotating to a new property every few days, to avoid
detection by law enforcement. I believe the SUBJECTS sit in
their vehicles for extended periods of time after installing
skimming equipment at ATMs to ensure skimming devices remain
functional and do not cause the ATMs to shut down. I believe the
SUBJECTS stay in their vehicles near ATMs to retrieve skimming

equipment multiple times throughout the day to download stolen EBT data stored on the equipment.

58.  Based on my training and experience, I know that criminals involved in skimming fraud schemes make concerted efforts to conceal their skimming equipment and activities by employing various measures, such as countersurveillance techniques and hiding their skimming equipment in satchels, backpacks, portable speakers, and secret compartments in their vehicles. Additionally, experience in similar cases has established that criminals involved in skimming activities very often use storage units to store their skimming equipment to keep the equipment safe and to make it more difficult for law enforcement to find. In similar FBI skimming cases, agents found skimming devices, pinhole cameras, various ATM parts used to conceal the pinhole cameras, blank ATM cards and gift cards used to create cloned ATM cards, computer devices to download and decrypt the data, machines used to encode data on ATM/gift cards, receipts and shipping labels, and other items used in furtherance of skimming operations. By searching the SUBJECT LOCATION, I expect to find evidence of a crime, contraband and fruits of a crime, and property designated for use in the above crimes. Such information will aid investigators in learning the scale of the SUBJECTS' skimming operation, technical ability of the SUBJECTS, suppliers of skimming equipment, and skimming crew leaders.

59.  This investigation is ongoing, and agents are working to establish further patterns, identify additional subjects

involved in these crimes, and ultimately arrest the subjects involved. It is my belief that probable cause exists to search the SUBJECT LOCATION. Based on the patterns witnessed to date and described above, I expect the SUBJECT LOCATION to continue to be used in the types of crimes described above, which will yield additional evidence of the crimes and organizations being investigated.

60.  Based on the information obtained to date in the investigation, I believe that a search of the SUBJECT LOCATION will uncover additional evidence to demonstrate that SANDU, GHERASIE, and their associates are part of a skimming crew conducting skimming activities in violation of SUBJECT OFFENSES.

61.  Several reasons support the reasonable necessity of granting authority to seize wires, stored wires, electronic communications and information upon entry into the SUBJECT LOCATION. As stated, based on the investigation to date, I believe that entry into the SUBJECT LOCATION will reveal evidence of a crime, contraband and fruits of a crime, and property designated for use in the above crimes, including electronic devices. I also believe, based on my training and experience in investigating skimming activities and fraud schemes and the investigation to date, that in addition to those observations, the other source of evidence relating to skimming activities will be in the form of electronic data. That data will likely include all records relating to the functioning of skimming devices, but not be limited to, download of data from skimming devices containing stolen EBT card numbers, video

recording of victims' PINs, decryption of data obtained from skimming devices, and applications used to encode the stolen EBT data on replicated ATM cards. Thus, the electronic data described above, and more fully in Attachment B, constitutes fruits, instrumentalities and evidence of the crimes under the investigation and failure to obtain such evidence will compromise the progress of the investigation. Indeed, the failure to seize such evidence may impede further efforts to investigate the crimes of which SANDU, GHERASIE, and others are suspected of committing.

62.   During the course of this investigation, I have consulted with other Special Agents in the office, including Special Agents in the FBI Computer Analysis Response Team (CART).

63.   I have learned from the CART investigators that information can be stored in an electronic form on a storage medium. A storage medium can be defined as any physical object upon which information can be stored in an electronic format. Examples of storage media include computer hard drives, removable digital media (e.g. external drives, CD/DVD disks, flash memory cards and drives, floppy disks, computer tapes, etc.), smart phones (e.g. iPhones, Android phones, Blackberries, etc.), tablets (e.g. iPads and Android Tablets), scanners, photocopiers, fax machines, digital camera storage cards, USB drives, and computerized gaming systems (e.g. XBox, PlayStation, Wii, etc).

64.   As described above and in Attachment B, this application seeks authority to seize records found in data stored on storage media. Thus, the warrant applied for would authorize the covert seizure of storage media including computer hard drives or, potentially, the copying of electronically stored information, all under Federal Rule of Criminal Procedure 41(e)(2)(B).

65.   I submit that if a storage medium is found at the SUBJECT LOCATION, there is probable cause to believe that records relating to skimming activities including but not limited to electronic communications, billing records, business receipts, expenditures, assets, and liabilities, including but not limited to records of online banking and other electronic financial transfer activity, electronically stored books and records, and online correspondence, will be stored on that storage medium for at least the following reasons:

(a)   Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

(b)   Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

(c)   Wholly apart from user-generated files, storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

(d)   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

(e)   Based on the inspection of other evidence related to this investigation, I am aware that computers and electronic devices were used for at least the download of data containing stolen EBT card number and download of video recording from Micro SD cards usually attached to pinhole cameras.

(f)   *Forensic Evidence*. As further described in Attachment B, this application seeks permission to locate not

only information stored on storage media that might serve as evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT LOCATION because:

(1)   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

(2)   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the

United States to establish and prove each element or
alternatively, to exclude the innocent from further suspicion.
In my training and experience, information stored within a
computer or storage media (e.g., registry information,
communications, images and movies, transactional information,
records of session times and durations, internet history, and
anti- virus, spyware, and malware detection programs) can
indicate who has used or controlled the computer or storage
media. This "user attribution" evidence is analogous to the
search for "indicia of occupancy" while executing a search
warrant at a residence. The existence or absence of anti-virus,
spyware, and malware detection programs may indicate whether the
computer was remotely accessed, thus inculpating or exculpating
the computer owner. Further, computer and storage media activity
can indicate how and when the computer or storage media was
accessed or used. For example, as described herein, computers
typically contain information that log: computer user account
session times and durations, computer activity associated with
user accounts, electronic storage media that connected with the
computer, and the IP addresses through which the computer
accessed networks and the internet. Such information allows
investigators to understand the chronological context of
computer or electronic storage media access, use, and events
relating to the crime under investigation. Additionally, some
information stored within a computer or electronic storage media
may provide crucial evidence relating to the physical location
of other evidence and the suspect. For example, images stored on

a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement.

(3)   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

(4)   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer

34

evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

(5)   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

66.   Necessity of Copying Entire Computers or Storage Media: In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, in this instance where investigators will work to ensure the covert nature of the entry, agents will make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the

data either from accidental or intentional destruction. This is true because of the following:

(a)   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

(b)   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, imaging the storage media and reviewing it off-site in a controlled environment will allow its examination with the proper tools and knowledge.

36

(c)  Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

67.  Nature of Examination. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## V.  **DELAYED NOTICE**

68.  Pursuant to Section 3103a(b), I submit that there is reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result, and I request that the search warrant both prohibit the seizure of any tangible property and provide for giving of any notice required under Rule 41 to be delayed for 30 days after the date of execution.

69.  As this warrant seeks delayed notice pursuant to 18 U.S.C. § 3103a, it does not seek authorization to seize any tangible property.  However, to accommodate the specificity requirements of Rule 41, it lists in Attachment B items that may

be searched for (and photographed or otherwise copied) during the execution of the search.

70.   Based on my training and experience, as well as my involvement in this investigation, I believe that reasonable cause exists to delay the service of the warrant as normally required for a period of 30 days because I believe that providing immediate notification of the execution of the warrant may have the adverse result of placing the investigation into serious jeopardy.  The investigation is ongoing, and disclosure of the warrant will compromise this investigation.

71.   Specifically, due to the nature of the government's ongoing investigation, providing immediate notice of the warrant will alert the parties to the scope and nature of the investigation. If notice of this warrant is served on the users of the SUBJECT LOCATION before 30 days, it could result in flight from prosecution, destruction or tampering with evidence, intimidation of potential witnesses, and otherwise seriously jeopardize an ongoing, complex, multi-jurisdictional ATM skimming investigation.

## VI.  REQUEST FOR SEALING

72.   Based on my training and experience, as well as my involvement in this investigation, I believe that reasonable cause exists to delay the service of the warrant as normally required for a period of 30 days because I believe that providing immediate notification of the execution of the warrant may have the adverse result of placing the investigation into serious jeopardy.  The investigation is ongoing, and disclosure

of the warrant will compromise this investigation.  For the same reasons set forth above in regarding the request to delay notice, I request that the warrant be filed under seal.

## VII.  SEARCH AT ANY TIME OF THE DAY OR NIGHT

73.  Because this affidavit seeks authorization for delayed notice, I seek authorization to execute the search warrant at any time of the day or night. There is good cause for this request because, based on observations and patterns of use, the SUBJECTS are less likely to access the SUBJECT LOCATION at night, reducing the risk that the SUBJECTS would be alerted to the ongoing investigation.

## VIII.  CONCLUSION

74.  Based on the information described above, I have probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT LOCATION, as further described above and in Attachment A of this affidavit.


Attested to by the applicant in
accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
_____ day of January 2024.


_____
HON. ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE